UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CITY OF CHARLESTON, WEST VIRGINIA,
CITY OF HUNTINGTON, WEST VIRGINIA,
CITY OF KENOVA, WEST VIRGINIA, and
TOWN OF CEREDO, WEST VIRGINIA,
municipal corporations, and other municipal
corporations similarly situated,

        Plaintiffs,

v.                                    Civil Action No. 2:17-cv-04267

THE JOINT COMMISSION f/k/a
THE JOINT COMMISSION ON ACCREDITATION OF HEALTH
CARE ORGANIZATIONS, a not-for-
profit organization, and its wholly-owned
affiliate, JOINT COMMISSION
RESOURCES, INC. d/b/a JOINT
COMMISSION INTERNATIONAL, a
not-for-profit organization,

        Defendants.

MEMORANDUM OPINION AND ORDER

        Pending are the plaintiffs' motion for leave to amend the complaint [ECF No. 43] and motion to vacate the judgment [ECF No. 44], each filed August 17, 2020.  Additionally pending is the defendants' motion for leave to file a sur-reply [ECF No. 50], filed September 15, 2020, which motion is granted and the sur-reply attached thereto is deemed filed.

I.

This action, filed November 2, 2017, involved allegations against defendants The Joint Commission ("Joint Commission") and its wholly-owned subsidiary Joint Commission Resources, Inc. ("Joint Commission Resources") pertaining to their roles in the promulgation of Pain Management Standards (sometimes "PM Standards") used in accrediting health care organizations and other health care educational materials that purportedly led to the over-prescription of opioids to the detriment of the plaintiffs. See ECF No. 1 (Complaint). The plaintiffs, four West Virginia municipalities, brought three claims on behalf of themselves and others similarly situated, against the defendants: Count I, "Negligence, Gross Negligence and Willful Conduct"; Count II, "Unjust Enrichment"; and Count III, "Declaratory Judgment."[1]  Id. at ¶¶ 143-59.

The defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on January 29, 2018. ECF No. 19 (Joint Commission's Motion to Dismiss, or in the Alternative, Strike Class Action Allegations); ECF No. 21 (Joint Commission Resources' Motion to Dismiss).  On July 20, 2020, the

_____

[1]    The court notes, as it did in its July 20, 2020 memorandum opinion and order, that Count III requested injunctive, as well as declaratory, relief.  See ECF No. 41, at 76-78 (Memorandum Opinion and Order on the Motion to Dismiss).

court granted these motions by memorandum opinion and order and
dismissed the complaint by judgment order.  ECF No. 41; ECF No.
42 (Judgment Order).  The seventy-nine-page memorandum opinion
and order, found at ECF No. 41, offers a comprehensive
discussion of the reasons for dismissing each claim, of which a
brief summary is in order.

     The court determined that Count I failed for several
reasons relating to existence of a duty of care.  ECF No. 41, at
33-62.  Specifically, the court found that the economic loss
doctrine applied to bar Count I inasmuch as the plaintiffs
claimed economic losses and did not allege a "special
relationship" or "privity of contract" with the defendants that
might otherwise establish a duty of care.  ECF No. 41, at 33-45.

     The court also concluded that, notwithstanding the
application of the economic loss doctrine, the plaintiffs failed
to plead facts that could establish a duty of care inasmuch as
they did not "plausibly show that defendants could reasonably
foresee the harms described in the complaint."  Id. at 45-53.
In doing so, the court: observed that the defendants did not
control the manufacture, distribution, or prescription of
opioids; noted that the Pain Management Standards promulgated by
the Joint Commission did not mention opioids or mandate their
prescription; and found persuasive the defendants' argument that

"independent standards organizations like themselves do not generally owe a duty to the intended recipients of those standards, let alone third parties." Id. at 49-53.  The court determined that additional policy considerations weighed against finding a duty of care inasmuch as, inter alia, doing so would expose the defendants to "a liability to the public at large with no manageable limits" and, relatedly, the learned intermediary doctrine counseled against finding such a duty. Id. at 53-60.

Regarding the gross negligence and reckless and willful conduct allegations found in Count I, the court concluded that "[t]he lack of foreseeability or duty of care precludes any showing that defendants were grossly negligent or conscious that the injury to plaintiffs was the likely or probable result of their conduct."  Id. at 62.

The court also determined that the complaint did not adequately plead proximate cause, a necessary element of the Count I claims and the Count II unjust enrichment claim.  Id. at 62-76.  In so holding, the court summarized the chain of events that allegedly led to the plaintiffs' injuries alleged in the complaint:

(i) After defendants promoted incorrect claims about
the safety of opioids in promulgating the PM Standards
and providing consulting services and accreditation to
HCOs, (ii) HCOs [Health Care Organizations] adopted
pain management protocols to ensure compliance with
the PM Standards, (iii) licensed independent
practitioners prescribed opioid medication based on
these protocols and their own judgment, (iv) which led
to a flood of opioid medication as well as a black
market for addicts, and (v) this crisis forced
plaintiffs to expend far greater resources and
expenditures to combat addiction, respond to crime,
and to support the numerous other costs alleged in the
complaint.

Id. at 73-74.  The court observed that the "[p]laintiffs' claims

rely on various criminal actions of third parties, such as

'illegal drug trafficking,' 'criminal vagrancy,' 'stolen

merchandise,' and 'property crimes,' as triggering a need for

increased governmental services and remediation" and that the

plaintiffs' claims are also dependent on the decisions of

licensed independent medical professionals to overprescribe

opioids to patients.   Id. at 75.  "[G]iven the numerous

intervening events and parties standing between [the plaintiffs

and the defendants]," the court concluded that the complaint,

"failed to plead that the pain management strategies promoted by

defendants proximately caused the widespread societal ills and

costs suffered by plaintiffs."  Id. at 74.

        The court dismissed Count III, which sought

declaratory and injunctive relief, inasmuch as this count did

not assert an independent cause of action but simply sought

relief based on the underlying claims asserted in Counts I and II that were dismissed. Id. at 76-78.

The plaintiffs contemporaneously filed their two pending motions on August 17, 2020. ECF No. 43 (Motion for Leave to Amend the Complaint); ECF No. 44 (Motion to Vacate the Judgment). The motion to vacate the judgment states, in full:

> The plaintiffs respectfully move to vacate the judgment under Rule 59(e) or 60(b) so that the Court may consider the motion for leave to amend filed earlier today. The plaintiffs are seeking this relief only if the Court decides to grant the pending motion for leave to amend. If the Court denies our motion for leave to amend, then it should deny this motion as well.

ECF No. 44.

Attached to the motion for leave to amend is a copy of the plaintiffs' proposed amended complaint with three exhibits.[2] ECF No. 43-1 (Proposed Amended Complaint with Three Exhibits).

---

[2] One of these exhibits, Exhibit 3, is an April 13, 2016 letter from Physicians for Responsible Opioid Prescribing to Dr. Mark Chassin, the president and CEO of the Joint Commission, relaying concerns about the Pain Management Standards' effect on opioid prescription and abuse. ECF No. 43-1, at 68-71 (April 13, 2016 letter from Physicians for Responsible Opioid Prescribing to Dr. Mark Chasson). The body of this letter was quoted in the original complaint, ECF No. 1, at ¶ 82.a-d, and referenced by the court in its July 20, 2020 memorandum opinion and order, ECF No. 41, at 15, 27-28, 48, 58, 59.

Thus, although the letter itself was not attached as an exhibit to the original complaint, its inclusion as an exhibit to the proposed amended complaint does not substantively present new allegations. Exhibits 1 and 2 present new materials and are discussed herein.

6

The motion first contends that the proposed amendments avoid the economic loss doctrine defects of the original complaint identified by the court inasmuch as the proposed amended pleading now alleges physical harm to the plaintiffs' property. ECF No. 43, at 2-3.  According to the plaintiffs, several proposed amendments address this issue: (1) an allegation that "[m]unicipalities bear the cost of removing [opioid-addicted] residents, repairing or bulldozing the[ir abandoned] houses, and remediating the environmental pollutants that affect not only the lots on which the abandoned houses sit but also public property owned by the plaintiffs," ECF No. 43-1, at ¶ 143; (2) an allegation that "pollution associated with the opioid crisis also takes place in public streets, parks, and parking lots owned by the Municipalities, which have been damaged by human waste, used needles, and trash discarded by people who have entered the Municipalities to obtain drugs, and which the Municipalities bear the cost of cleaning up," id. at ¶ 144; an allegation of "deterioration in environmental quality," namely, that "Water supplies are harmed by the flushing of over-supplied opioids down toilets and drains, human waste, and trash"; and an allegation that physical damage associated with opioid-related pollution has "significantly reduced the aesthetic beauty of the municipalities and their surrounding environments," id. at ¶ 146.

The plaintiffs further contend, "The amended complaint also reiterates and clarifies the non-economic losses that the plaintiffs have suffered on account of the defendants' behavior, such as aesthetic harms and environmental pollution."  ECF No. 43, at 3; see also ECF No. 49, at 2 (Reply in Support of Motion for Leave to Amend the Complaint).  They cite one proposed amendment in support of this claim, an allegation that "they have suffered non-economic loss, including but not limited to disruptions to quality of life, losses of recreational opportunities, and significant community blight.  In addition, plaintiffs allege devaluation of property, environmental pollution, and the elevation in the spread of infectious diseases."[3]  ECF No. 43-1, at ¶ 41.

The plaintiffs also assert that the proposed amended complaint avoids the economic loss doctrine inasmuch as they now plead a "special relationship" with the defendants.  ECF No. 43, at 4.  The proposed amended complaint alleges that since the Joint Commission has "sought to enact through state

_____

[3]    Like the original complaint, the proposed amended complaint continues to allege the following damages characterized as "economic damages": "increased health care costs, insurance and self-insurance costs, health services costs, costs related to responding to and dealing with opioid-related crimes and emergencies, additional first responders, first responder and building department overtime, remediation of dilapidated and fire-damaged properties,[] criminal vagrancy, and other significant public safety costs."  ECF No. 43-1, at ¶ 41.

legislatures" certain "statutory provisions" pertaining to
health care accreditation,

> Plaintiffs and other governmental entities rely upon
> JCAHO to enact responsible standards and to enforce
> those standards in a responsible manner, including but
> not limited to standards related to pain management
> and opioid prescribing. Plaintiffs and other
> governmental entities further rely on JCAHO and JCR to
> adequately investigate the basis for any standards as
> well as any information JCAHO and JCR provide to
> health care organizations or physicians, or that JCAHO
> and JCR suggest or require that health care
> professionals provide to patients.

ECF No. 43-1, at ¶ 21. It further alleges:

> Plaintiffs did not see the need to impose or enforce
> their own standards on health care organizations and
> providers concerning the minutiae of pain management
> or opioid prescribing practices. As a consequence,
> Plaintiffs quite reasonably focused their regulatory
> and enforcement efforts on the unlicensed transfer of
> drugs, and rely on JCAHO to enforce its own standards
> concerning pain management.

Id. at ¶ 22. As a result of this "sacred trust" placed in the
defendants, the proposed amended complaint alleges that "the
public record reveals no local ordinances designed to regulate
opioid prescriptions at those health care organizations." Id.
at ¶ 23. These amended allegations, in the plaintiffs'
estimation, establish a special relationship between them and
the defendants. ECF No. 43, at 4.

The plaintiffs further posit that the proposed
amendments, and attached exhibits, resolve the deficiencies
identified by the court that relate to foreseeability as it

pertains to the existence of a duty of care.  Id. at 4-5.  On

this point, the proposed amended complaint adds the following

allegations:

> 85. In September 2006, Dr. Andrew Kolodny then the
> Vice Chair for Clinical Psychiatry in the Department
> of Psychiatry at Maimonides Medical Center, spoke at
> length with Kelly Podgorny, project director in
> JCAHO's Division of Standards and Survey Methods and
> the subject matter liaison for the Medication
> Management Standards, about the unintended
> consequences of broad based (rather than targeted)
> pain assessments as required by the JCAHO standard
> PC.8.10 "pain is assessed in all patients". Dr.
> Kolodny expressed his concerns about widespread
> addition [sic], including by those individuals who
> were not directly prescribed opioids under JCAHO
> standards.  Dr. Kolodny also provided Ms. Podgorny
> with Exhibits 1 and 2 on September 20, 2006.
>
> 86. Dr. Kolodny explained to Ms. Podgorny that Exhibit
> 1 "documents a new epidemic of narcotic analgesic
> overdose deaths.  [Exhibit 1] demonstrates that the
> overdose death rate increase has occurred in
> conjunction with a national trend toward more
> aggressive pain management."
>
> 87. Dr. Kolodny explained to Ms. Podgorny that Exhibit
> 2 "documents a new epidemic of narcotic analgesic
> abuse. Narcotic analgesics are now the second most
> commonly abused class of drugs in the United States.
> Like overdose deaths, the increase in abuse of
> narcotic analgesics also corresponds with the trend
> toward more aggressive management of pain that has
> occurred over the past decade."

ECF No. 43, at ¶¶ 85-87.  Exhibit 1 referenced therein is a

report entitled "Increasing deaths from opioid analgesics in the

United States," published in 15 Pharmacoepidemiology and Drug

Safety 618-27 (2006).  ECF No. 43-1, at 55-64 (Exhibit 1 to

Proposed Amended Complaint).  Exhibit 2 referenced therein is a

May 21, 2004 article published in The NSDUH (National Survey on
Drug Use and Health) Report, "an annual survey sponsored by the
Substance Abuse and Mental Health Services Administration
(SAMHSA)" of the United States Department of Health and Human
Resources, entitled "Nonmedical Use of Prescription Pain
Relievers."  Id. at 65-67 (Exhibit 2 to Proposed Amended
Complaint).

        The plaintiffs further contend that they have "add[ed]
allegations involving historical, empirical, and observational
evidence that widespread opiate use leads to the very harms the
plaintiffs allege in their complaint, and that as health care
professionals, the defendants knew or should have known of this
historical, empirical, and observational evidence."  ECF No. 43,
at 5.  These added allegations that purportedly support
foreseeability are as follows:

        42. In promulgating, enforcing, and educating about
        the Pain Management Standards, Defendants, along with
        manufacturers and industry front groups, sought to
        overturn years of proven medical treatment practices
        dating to at least the start of the 20th Century,
        based on hard-learned lessons in China and the United
        States demonstrating that opiates are highly addictive
        and that their widespread use empirically and
        historically leads to a dizzying array of widespread
        damages to municipalities.

        43. China, in 1839, was so distressed by Britain's
        importing of opium and the widespread damages
        associated with large-scale addiction that it went to
        war with Britain to prevent future imports.  The
        damages inflicted on Chinese municipalities by

Britain's opium importing and promotion were similar
to the damages suffered by Plaintiffs.  Defendants, as
health care experts, knew or should have known that
widespread use of opiates leads to widespread impacts
on municipalities.

44. After the Civil War, doctors in the United States
increased their prescribing of opium, causing
widespread harm to municipalities similar to that
suffered by Plaintiffs today.  Defendants, as health
care experts, knew or should have known that
widespread use of opiates leads to widespread impacts
on municipalities.

45. As a result of this history, and the experience of
health care professionals with those who are addicted
to opiates, physicians were reluctant to prescribe
opioids for fear of patient dependency and the broader
consequences of widespread addiction.  Thus, the
damages Plaintiffs experienced were not only
foreseeable, they were foreseen by those who had
learned from history and experience.  This was the
prevailing wisdom throughout the medical profession
prior to Defendants' efforts, in conjunction with
pharmaceutical companies and others, to reverse nearly
a century of medical knowledge and practice.

46. According to the Smithsonian magazine's review of
the post-Civil War opium crisis: Educating doctors was
key to fighting the epidemic.  Medical instructors and
textbooks from the 1890s regularly delivered strong
warnings against overusing opium.  "By the late 19th
century, [if] you pick up a medical journal about
morphine addiction," says Courtwright, "you'll very
commonly encounter a sentence like this: 'Doctors who
resort too quickly to the needle are lazy, they're
incompetent, they're poorly trained, they're behind
the times.'"  Defendants therefore knew or should have
known as health care experts that this type of
messaging is particularly effective in getting health
care professionals to change the way patients are
treated, and this is precisely the type of messaging
Defendants used as part of their means of interfering
with the treatment of pain.

ECF No. 43-1, at ¶¶ 42-46 (alteration in Proposed Amended

Complaint); see also id. at ¶ 176 ("Furthermore, Defendants

decided to reverse nearly a century of medical knowledge and practice.  Defendants did so based on little or no research.").

Finally, the plaintiffs argue that the proposed amended complaint pleads additional facts to establish proximate cause and "rebut any assumption that physicians who prescribed the opioids relied on their 'independent medical judgment.'" ECF No. 43, at 6.  On this point, the proposed amended complaint emphasizes the Joint Commission's "power and influence over medical practices."  ECF No. 43-1, at ¶ 26.  The plaintiffs allege that according to the Joint Commission itself, as admitted in an amicus brief in a case before the Supreme Court of the United States, "the Medicare Act of 1965, 42 U.S.C. § 1395bb, specifically provides that hospitals accredited by The Joint Commission, subject to certain limited exceptions, are deemed to be eligible to participate in the Medicare program." Id. at ¶ 24 (quoting a brief filed in Christie v. Adkins, No. 07-538, 2007 WL 4178499, at *2 (U.S. Nov. 21, 2007)).

The plaintiffs also quote a Karen Sibert, M.D., who wrote in 2014:[4]

> The Joint Commission has the power to decide whether the hospital deserves reaccreditation. Administrators, doctors, nurses, technicians, clerks, and janitors will be obsessed with the fear that the

---

[4]    The plaintiffs give no context for this quotation other than that it was written by Sibert in 2014.

> reviewers will see them doing something that the Joint
> Commission doesn't consider a "best practice", and
> that they'll catch hell from their superiors. For you
> as a patient, any idea that your clinical care and
> your medical records are private becomes a delusion
> when the Joint Commission is on site. Their reviewers
> are given complete access to all your medical records,
> and they may even come into the operating room while
> you're having surgery without informing you ahead of
> time or asking your permission.
>
> [. . .]
>
> A few competitors, such as the international firm DNV
> GL, have started to make inroads in the lucrative
> business of accrediting hospitals, but for the time
> being the Joint Commission holds a virtual monopoly in
> the U.S.
>
> [. . .]
>
> . . . when the Joint Commission declares that evidence
> supports one treatment or medication as a standard of
> quality in healthcare, <u>it</u> <u>forces</u> <u>clinicians</u> <u>to</u> <u>follow</u>
> <u>that</u> <u>recipe</u>.  If they don't, the hospital will score
> poorly on its next review.
>
> [. . .]
>
> Meanwhile, at my hospital, the level of tension is
> rising as we anticipate Joint Commission review within
> the next few weeks.  Experienced nurses are pulled
> away from patient care to make mock review rounds.
> Department chairs circulate memos about minute details
> that could trip us up.  One chairman concluded
> succinctly, "These people are not your friends."

<u>Id.</u> at ¶ 25 (alterations and emphasis in Proposed Amended

Complaint).  On a similar note, the plaintiffs allege, without

citing to a particular instance, that "Defendants threatened

physicians with potential malpractice liability if opioids were

underprescribed and ridiculed physicians who believed opioids

were addictive."  <u>Id.</u> at ¶ 4.

Additionally, the plaintiffs claim that the proposed amended complaint alleges proximate cause inasmuch as it outlines the Joint Commission's enforcement of its Pain Management Standards. ECF No. 43, at 6. The proposed amended complaint describes the Joint Commission's surveys of health care facilities, which occur at least once every thirty-nine months and which health care professionals allegedly claim to cause "great anxiety." ECF No. 43-1, at ¶ 100. The proposed amended complaint alleges that Joint Commission surveyors "review patient charts to determine compliance with JCAHO standards, including the Pain Management Standards. Pain assessment and reassessment is reviewed, as well as how the health care provider responded to the pain assessment." Id. at ¶ 101. The plaintiffs further claim that Joint Commission surveyors interview healthcare professionals to "review the informational material provided to patients, expecting to see material similar to that produced or distributed by JCR and endorsed by JCAHO . . . ." Id. at ¶ 101.

It is also alleged that:

> [h]ealth care organizations risk their accreditation if their charts and staff interviews do not echo the JCR materials in terms of opioid treatment practices, e.g., prescribing or providing opioids with little concern that they are addictive, administering opioids in doses designed to make the patient free of pain, and providing patients materials like Health Facts for

15

<u>You</u> that grossly misinform patients about the risks of opioids.

<u>Id.</u> at ¶ 102.  According to the plaintiffs, "In areas where the health care provider fails to meet the JCAHO surveyor's view of how the pain management standard should be implemented, the health care organization is given 'requirements for improvement' and is expected to follow them in order to remain accredited." <u>Id.</u> at ¶ 103.

The proposed amended complaint includes the following quotation alleged to be found on the Joint Commission's website:

JCAHO's influence extends well beyond the survey, however, as JCAHO describes on its website: Joint Commission accreditation does not begin and end with the on-site survey.  It is a continuous process.  Every time a nurse double-checks a patient's identification before administering a medication, every time a surgical team calls a "time out" to verify they agree they're about to perform the correct procedure, at the correct site, on the correct patient, <u>they</u> <u>live</u> <u>and</u> <u>breathe</u> <u>the</u> <u>accreditation</u> <u>process</u>.  Every three months, hospitals submit data to the Joint Commission on how they treat conditions such as heart attack care and pneumonia — data that is available to the public and updated quarterly on qualitycheck.org.  Throughout the accreditation cycle, organizations are provided with a self-assessment scoring tool to help monitor their ongoing standards compliance.  <u>Joint</u> <u>Commission</u> <u>accreditation</u> <u>is</u> <u>woven</u> <u>into</u> <u>the</u> <u>fabric</u> <u>of</u> <u>a</u> <u>health</u> <u>care</u> <u>organization's</u> <u>operations</u>.

<u>Id.</u> at ¶ 105 (emphasis in Proposed Amended Complaint).  The proposed amended complaint also states, without particularization, as follows:

> JCAHO surveyors began faulting health care providers
> for not addressing pain quickly enough through
> opioids, even though providing opioids in this manner
> was totally irresponsible.  Because JCAHO and JCR also
> falsely claimed that opioids were essentially
> risk-free, JCAHO and JCR made what health care
> professionals previously believed was totally
> irresponsible seem like the responsible path.

Id. at ¶ 106.

The plaintiffs assert that there was no undue delay in
seeking to amend the complaint after a ruling on the motions to
dismiss inasmuch as they had no indication how the court would
rule prior to the entry of the memorandum opinion and order on
July 20, 2020, and they "reasonably believed the facts the
defendants claimed in their reply were not in the complaint were
fair inferences from what was alleged."  ECF No. 49, at 4-5.
Moreover, they assert that delay alone is insufficient reason to
deny a motion to amend absent prejudice to opposing parties,
which, they claim, does not exist under the present
circumstances.  Id. at 5.

The defendants argue that amendment is futile and
should be denied inasmuch as the proposed amended complaint
"fails to satisfy the requirements of the federal rules,"
namely, Federal Rule of Civil Procedure 12(b)(6).  ECF No. 48,
at 7 (Response to Motion for Leave to Amend the Complaint)
(quoting Friend v. Remac America, Inc., 924 F. Supp. 2d 692, 696
(N.D. W. Va. 2013)).  Specifically, the defendants argue that

17

the plaintiffs cannot overcome the economic loss doctrine inasmuch as the new allegations pertaining thereto are merely repackaged iterations of their prior "community blight" and "disruptions to quality of life" allegations and the plaintiffs offer no caselaw in support of their position that such allegations are non-economic losses.  Id. at 8.  They further contend that the harm to water supplies allegation is not a well-pled fact entitled to an assumption of truth and that, notwithstanding this point, it contrasts with their theory of recovery, which is based on overconsumption of opioids, inasmuch as it alleges that residents have been flushing over-supplied opioids.  Id. at 9, 9 n. 2.  And insofar as the plaintiffs now allege harm to streets, sidewalks, and common areas, the defendants assert that such allegations are speculative and conclusory.  Id.

The defendants argue that the new allegations do not establish a "special relationship" such that the economic loss problem may be overcome inasmuch as the defendants' alleged conduct has not affected the plaintiffs differently from society in general.  Id. at 10.  The defendants also posit that a special relationship must be narrowly defined and the new "special relationship" alleged in the proposed amended complaint, which pertains to nationwide governmental reliance on

the Joint Commission's standards and enforcement of such

standards, cannot be narrowly defined if it is as widespread as

claimed.  Id. at 11.

As to foreseeability, the defendants note the

allegations relating to Kolodny's 2006 communications with the

Joint Commission as well as the allegations pertaining to

historical damages to municipalities in the United States and

China.  Id.  They assert, however, that such allegations "miss

the mark" on foreseeability inasmuch as they do not show that

the plaintiffs were invited to rely upon the Joint Commission's

Pain Management Standards.  Id. at 12.  Additionally, the

defendants contend:

> no additional allegations (and certainly not those in
> the Proposed Amendment) can change the nature of the
> parties' relationship — that of two independent
> standards organizations and third-party government
> entities.  As this Court previously held, independent
> standards organizations do not owe a duty to intended
> recipients of their standards, let alone third parties
> like Plaintiffs.

Id.

The defendants further contest the sufficiency of the

proposed amended complaint's new allegations pertaining to

proximate cause.  Id. at 12-14.  Insofar as the plaintiffs have

attempted to allege that prescribing physicians did not exercise

independent judgment, the defendants claim, "None of the new

allegations explains how Defendants 'overcame' physicians' independent medical judgment." Id. at 13.  Assuming this were the case, however, the defendants assert that numerous other intervening factors, including unnecessary over-prescription of opioids, drug trafficking, criminal vagrancy, and property crimes, contributed to the injuries alleged by the plaintiffs, precluding proximate cause.  Id. at 13-14.

The defendants additionally contend that amendment should be denied inasmuch as the plaintiffs were dilatory in their efforts to seek amendment and amendment would prejudice them.  Id. at 14-17.  They contend that the plaintiffs were dilatory inasmuch as they should have moved for leave to amend the complaint rather than oppose the motions to dismiss during the two-and-a-half-year window the motions were pending.  Id. at 15.  They also observe that such action would have been possible since the new facts contained in the proposed amended complaint were available to the plaintiffs at the outset of the litigation.  Id. at 16.  The defendants further contend that "[a]llowing Plaintiffs leave to amend under these circumstances would both delay final justice and significantly prejudice Defendants by forcing them to re-start their legal defense nearly three years after suit was first filed."  Id. at 4.

II.

Federal Rule of Civil Procedure 15(a)(1) allows a
party to amend a pleading once as a matter of course "within 21
days after serving it," or, "if the pleading is one to which a
responsive pleading is required, 21 days after service of a
responsive pleading or 21 days after service of a motion under
Rule 12(b), (e), or (f), whichever is earlier."  Rule 15(a)(2)
provides that "[i]n all other cases, a party may amend its
pleading only with the opposing party's written consent or the
court's leave.  The court should freely give leave when justice
so requires."

The Fourth Circuit has "interpreted Rule 15(a) to
provide that 'leave to amend a pleading should be denied only
when the amendment would be prejudicial to the opposing party,
there has been bad faith on the part of the moving party, or the
amendment would have been futile.'"   Laber v. Harvey, 438 F.3d
404, 426 (4th Cir. 2006) (en banc) (quoting Johnson v. Oroweat
Foods Co., 785 F.2d 503, 509 (4th Cir. 1986)).   "Futility is
apparent if the proposed amended complaint fails to state a
claim under the applicable rules and accompanying standards . .
. ."  Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 (4th
Cir. 2011).

"[A] post-judgment motion to amend is evaluated under the same legal standard as a similar motion filed before judgment was entered — for prejudice, bad faith, or futility." Laber, 438 F.3d at 427 (citing Foman v. Davis, 371 U.S. 178, 182 (1962); Johnson, 785 F.2d at 509-10).  Although a post-judgment motion to amend may not be granted unless it is appropriate to vacate the judgment under Rule 59(e) or Rule 60(b), the court "need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a)."  Katyle, 637 F.3d at 471.

## III.

The July 20, 2020 memorandum opinion and order identified four independent reasons that the negligence claim asserted in Count I should be dismissed for failure to state a claim, three of which (the economic loss doctrine, foreseeability, and policy considerations) pertained to the existence of a duty of care and one of which pertained to proximate cause.  The memorandum opinion and order likewise found that the gross negligence and reckless and willful conduct claims contained in Count I should be dismissed inasmuch as the complaint did not adequately plead a duty of care generally or foreseeability.  Additionally, the court found that the unjust enrichment claim alleged in Count II failed for lack of

proximate cause.  Finally, the court found that dismissal of
Count III was warranted inasmuch as dismissal of Counts I and II
was appropriate.

At bottom, the question of whether the plaintiffs
should be granted leave to amend their complaint centers on
whether the proposed amended complaint adequately addresses each
independent deficiency warranting dismissal of Count I and Count
II.  The proposed amended complaint does not accomplish this
task for several reasons.

First, the proposed amended complaint does not
adequately address foreseeability as it pertains to the
existence of a duty of care.  On foreseeability, the plaintiffs
bring new allegations describing Kolodny's 2006 communications
with the Joint Commission and historical examples.  None of
these allegations address the foreseeability problems identified
in the court's analysis.  They do not address the court's
finding that "[u]nlike the manufacturer and distributor
defendants in Summit County, defendants here had no control or
responsibility over the manufacturing or distributing of
opioids.  Although the 2001 NPC Monograph and 2001 TJC Monograph
refer to opioids, the PM Standards themselves did not even
mention opioids or mandate opioid prescriptions."  ECF No. 41,
at 49.  Indeed, the plaintiffs acknowledge as much by the

allegation in its complaint at paragraph 56 which is set forth
in its proposed amended complaint at paragraph 72: "JCAHO's Pain
Management Standards never overtly required opioid treatments."
An exception to the absence of mention of opioids in the PM
Standards applies in that, as alleged in the complaint at
paragraph 86, "In 2016, JCAHO . . . reexamined the Pain
Management Standards and in July 2017 issued new Standards to
take effect in January of 2018," as a result of which Standard
LD.04.03.13 prescribed as follows:

> Standard LD.04.03.13
> Pain assessment and pain management, including safe
> opioid prescribing is identified as an organizational
> priority for the hospital.

R[3] Report, The Joint Comm'n (Aug. 29, 2017).

        As the defendants correctly note, the proposed
amendments do not address the foreseeability analysis' emphasis
on caselaw indicating that independent standards organizations
like the defendants do not generally owe a duty of care to the
intended recipients of those standards, i.e., the health care
organizations in this action, let alone third parties like the
municipality plaintiffs.  Id. at 49-53 (citing In re Welding
Fume Prod. Liab. Litig., 526 F. Supp. 2d 775, 799, 800 n.114
(N.D. Ohio 2007); Evenson v. Osmose Wood Preserving, Inc., 760
F. Supp. 1345, 1349 (S.D. Ind. 1990); Gunsalus v. Celotex Corp.,
674 F. Supp. 1149, 1157 (E.D. Pa. 1987); Klein v. Council of

Chem. Ass'ns, 587 F. Supp. 213, 225 (E.D. Pa. 1984); Meyers v.

Donnatacci, 531 A.2d 398, 403 (N.J. Super. Ct. 1987); Bailey v.

Edward Hines Lumber Co., 719 N.E.2d 50, 178 (Ill. App. Ct.

1999)).

        Additionally, the court observes that the July 20,

2020 memorandum opinion and order quoted Syllabus Point 3 of

Sewell v. Gregory, 371 S.E.2d 82, 83 (W. Va. 1988), in which the

Supreme Court of Appeals of West Virginia held:

> The ultimate test of the existence of a duty to use
> care is found in the foreseeability that harm may
> result if it is not exercised. The test is, would the
> ordinary man in the defendant's position, knowing what
> he knew or should have known, anticipate that harm of
> the general nature of that suffered was likely to
> result?

The court likewise quoted Robertson v. LeMaster, 301 S.E.2d 563,

568 (W. Va. 1983), for the proposition that "[d]ue care is a

relative term and depends on time, place, and other

circumstances.  It should be in proportion to the danger

apparent and within reasonable anticipation."  These quotations

make clear that foreseeability does not gauge whether the

defendants could foresee any harm resulting from their conduct,

but rather involves an inquiry of whether the defendants could

foresee a harm similar to that actually suffered.

        Neither the Kolodny nor the historical allegations of

the proposed amended complaint remotely relate to the physical

25

harms now alleged by the plaintiffs.  There is no allegation
that Kolodny told the Joint Commission about public property
damage and pollution that could conceivably impact
municipalities.  And there is no allegation that municipalities
in China and the United States experienced physical harms, such
as water pollution due to opioids flushed down toilets or other
opioid-related pollution on publicly owned streets and
sidewalks, after a rise in opium consumption and addiction
during the Nineteenth Century – there are only vague allusions
by plaintiffs to that which they call "a dizzying array of
widespread damages to municipalities," "damages . . . similar to
the damages suffered by Plaintiffs," and "widespread harm to
municipalities."  ECF No. 43-1, at ¶¶ 43-44.

        And to the extent the economic damages, "community
blight," "disruptions to quality of life," "losses of
recreational opportunities," aesthetic harms, and related
injuries alleged, id. at ¶¶ 41, 146, are not barred by the
economic loss doctrine since obscure physical harms to the
plaintiffs' properties are also alleged,[5] the Kolodny and
historical allegations still fail to relate to these harms.  The

---

[5]    The court need not decide whether the proposed amended
complaint cures all economic loss doctrine problems identified
in the July 20, 2020 memorandum opinion and order, see ECF No.
41, at 33-45, inasmuch as it is clear that Count I remains
deficient for the other reasons discussed herein.

Kolodny-related allegations have nothing to do with harms to municipalities, and the historical harm examples are so vague that they do not even allege that Chinese and American municipalities suffered "harm of the general nature of that suffered" by the plaintiffs according to the proposed amended complaint.  Syl. Pt. 3, <u>Sewell</u>, 371 S.E.2d at 83.

Second, the proposed amended complaint does not adequately address the policy considerations discussed in the July 20, 2020 memorandum opinion and order.  In the memorandum opinion and order, the court quoted <u>Robertson</u>, 301 S.E.2d at 568, for the proposition, "Beyond the question of foreseeability, the existence of duty also involves policy considerations underlying the core issue of the scope of the legal system's protection."  ECF No. 41, at 53.  "These policy factors 'include the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant.'"  <u>Id.</u> (quoting <u>Robertson</u>, 301 S.E.2d at 568).

With regard to the latter two factors, the court found as follows:

> [T]he consequences of imposing this duty on defendants would expose them to a liability to the public at large with no manageable limits.  <u>Aikens</u> noted that "[e]ach segment of society will suffer injustice, whether situated as plaintiff or defendant, if there

27

are no finite boundaries to liability." 541 S.E.2d at
592. The "[c]ourt's obligation is to draw a line
beyond which the law will not extend its protection in
tort, and to declare, as a matter of law, that no duty
exists beyond that court-created line." Id. Several
intermediaries stand in between plaintiffs and
defendants, including the HCOs responsible for issuing
their own pain management protocols, the medical
practitioners responsible for issuing opioid
treatments, as well the pharmaceutical manufacturers,
distributors, and retailers who bring the opioids to
market in the first place.

Id. at 55 (second alteration in the July 20, 2020 memorandum

opinion and order). The court similarly found that the learned

intermediary doctrine, which restricts the liability of

prescription drug and medical device manufacturers to patients

if they warn practitioners of the dangers associated with their

products, weighed against finding a duty, "where the independent

medical practitioners [in this case] assumed ultimate

responsibility for advising patients about opioid risks and,

compared to the opioid manufacturers themselves, defendants are

at least one step further removed from the individual patients."

Id. at 57. Indeed, the court found the plaintiffs'

acknowledgement that "[h]ealth care professionals are capable of

using their clinical judgment to determine when to assess

patients for pain" to be indicative of a "corollary principle

that physicians exercise their independent clinical judgment in

patient evaluations, including when deciding whether to

prescribe opioid treatments."  Id. at 59 (alteration in the July 20, 2020 memorandum opinion and order).

These points formed the basis of the court's conclusion that "[t]he enormous scale of the opioid crisis has reached almost every corner of society, but the court must draw a line somewhere.  It cannot extend a duty to the full constellation of individuals and communities who have suffered in the wake of the opioid crisis without running afoul of Aikens."  Id. at 60.  Nothing offered in the proposed amendments refutes this conclusion.  As the defendants argue, the new allegations pertaining to the Joint Commission's efforts to enforce their standards through surveys and otherwise do not demonstrate that practitioners at accredited health care organizations had their independent medical judgments overcome by those of the Joint Commission.  Indeed, the plaintiffs effectively allege, through the citation to Exhibit 3 in paragraph 108.b, that "[h]ealth care professionals are capable of using their clinical judgment to determine when to assess patients for pain."  ECF No. 43-1, at ¶ 108.b.

And the court's general policy reasoning relating to intermediaries remains unchanged.  This case does not involve claims alleged by a plaintiff against a prescribing physician or drug manufacturer defendant.  Between the plaintiffs and the

defendants stand the opioid manufacturers, opioid distributors, accredited health care organizations, opioid prescribers who possess independent medical judgment, and patients and other third-parties who must commit additional acts, such as polluting, to cause the harms alleged by the plaintiffs.  Courts have an obligation to draw lines beyond which no duty of care exists.  Aikens, 541 S.E.2d at 592.  From a policy standpoint, the proposed amended complaint continues to assert a duty of care that falls beyond such a line.

Third and similarly, the proposed amended complaint fails to adequately plead proximate cause.  The new allegations concerning the power of the Joint Commission over practitioners at accredited health care organizations and the enforcement of standards through surveys and related activities could not, if true, establish that the independent medical judgment of prescribing practitioners was overborne by the defendants.  And even if they could establish this, there remains an exceedingly long chain of independent actions between the defendants' conduct and the harms alleged by the plaintiffs, which includes, inter alia, opioid manufacture and distribution, the acquiescence of health care organizations to a course of conduct that transcends the PM Standards promulgated by the defendants, the over-prescription of opioids by prescribing health care

professionals, the rise of a black market for opioids, and harms
such as pollution, vagrancy, and community blight resulting from
the use of opioids unnecessarily prescribed or obtained through
illegal means.  Simply put, the proposed amended complaint does
not, and cannot, adequately plead proximate cause due to the
plethora of independent actions that lie between the alleged
conduct of the defendants and the injuries allegedly suffered by
the plaintiffs.

        Inasmuch as foreseeability, policy considerations, and
proximate cause problems remain outstanding despite the new
allegations raised in the proposed amended complaint, amendment
of Count I would be futile.  And inasmuch as the unjust
enrichment claim found in Count II also requires a showing of
proximate cause, amendment thereof would also be futile.  Since
amendment of the two substantive counts would be futile, the
court finds that the July 20, 2020 memorandum opinion and
order's rationale for dismissing Count III's requests for
declaratory and injunctive relief stands.

        Inasmuch as it is clear that amendment would be futile
for the foregoing reasons, the court need not address the undue
delay and prejudice arguments of the defendants.

IV.

Accordingly, it is ORDERED that:

1.    The defendants' motion for leave to file a sur-reply (ECF No. 50) be, and it hereby is, GRANTED and the sur-reply attached thereto is deemed filed.

2.    The plaintiffs' motion for leave to file an amended complaint (ECF No. 43) be, and it hereby is, DENIED.

3.    The plaintiffs' motion to vacate the judgment (ECF No. 44) be, and it hereby is, DENIED.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER: September 20, 2021

John T. Copenhaver, Jr.
Senior United States District Judge